## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT D. DAVIS, MARY L. GIBBONS and WILLIAM HIGGINS, : : : | |
| Plaintiffs, : : | |
| v. : : | No. |
| TAYLOR BEAN & WHITAKER MORTGAGE CORPORATION, RAYMOND E. BOWMAN, GARY GARRETT, LEE FARKAS, PAUL ALLEN and SHERRY DICKINSON, : : : : : | |
| Defendants. : : | |

## COMPLAINT

Plaintiffs Robert D. Davis, Mary L. Gibbons and William Higgins (collectively referred to herein as "Plaintiffs") seek compensatory damages, as well as statutory penalties and attorneys fees, arising from Defendants Taylor Bean & Whitaker Mortgage Corporation, Raymond E. Bowman, Gary Garrett, Lee Farkas, Paul Allen, and Sherry Dickinson's misconduct depriving Plaintiffs of their compensation under their June 17, 2002 Employment Agreements ("Agreements"), including but not limited to failure to pay wages, bonus monies, vacation time, and stock ownership.

## PARTIES

1.     Plaintiff Robert D. Davis (hereinafter "Davis") is a citizen of the Commonwealth of Pennsylvania, residing at 1534 Mt. Pleasant Road, Villanova, Pennsylvania, 19085.

2.     Plaintiff Mary L. Gibbons (hereinafter "Gibbons") is a citizen of Commonwealth of Pennsylvania, residing at 2003 St. Andrews Drive, Berwyn, Pennsylvania, 19312.

3.    Plaintiff William Higgins (hereinafter "Higgins") is a citizen of Commonwealth of Pennsylvania residing at 101 Parliament Circle, North Wales, Pennsylvania, 19454.

4.    Defendant Taylor Bean & Whitaker Mortgage Corporation ("Taylor Bean"), upon information and belief, is a Florida corporation that is a national mortgage lending institution, with its principal place of business at 101 NE 2 Street, Ocala, Florida, 34470, and has offices in Pennsylvania located at 755 Business Center Drive, Suite 150, Horsham, PA 19044, and throughout the United States.

5.    Upon information and belief, Defendant Raymond E. Bowman (hereinafter "Bowman") is a Florida resident and was the President of Taylor Bean at all times relevant hereto.

6.    Upon information and belief, Gary Garrett (hereinafter "Garrett") is a Florida resident and was an officer of Taylor Bean at all times relevant hereto.

7.    Upon information and belief, Lee Farkas (hereinafter "Farkas") is a Florida resident and was Chief Executive Officer and Chairman of Taylor Bean at times relevant hereto.

8.    Upon information and belief, Paul Allen (hereinafter "Allen") is a Virginia resident and was Chief Executive Officer of Taylor Bean from August 8, 2004 to present.

9.    Upon information and belief, Sherry Dickinson (hereinafter "Dickinson") is a Georgia resident and was the Vice Chair of Taylor Bean at all times relevant hereto.

JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 as the parties are of completely diverse citizenship and the amount in controversy exceeds $75,000.

11.     This Court has personal jurisdiction over Defendants Taylor Bean, Bowman, Garrett, Farkas, Allen and Dickinson who regularly, continuously and systematically conducted business in the Eastern District of Pennsylvania.

12.     This Court has personal jurisdiction over Taylor Bean who employed Plaintiffs in Pennsylvania with a Pennsylvania office.

13.     This Court has personal jurisdiction over Defendants Bowman, Garrett, Farkas, Allen and Dickinson who negotiated and signed a lease to rent office space and equipment in Pennsylvania, supervised and managed employees including but not limited to Plaintiffs, continue to supervise and manage employees in the Pennsylvania office, visited the Pennsylvania office as well as other clients in Pennsylvania, contracted and engaged in business with Pennsylvania brokers, obtained Pennsylvania mortgage bankers licenses including submitting to criminal background check, submitting personal information and finger prints to the Pennsylvania Department of Banking, sent letters, sent e-mails, and made telephone calls, made use of the airfield at Wings Field in Bluebell, Pennsylvania to land, park and service private jet albeit in their official capacities, to Plaintiffs in Pennsylvania regarding mortgage lending transactions.

14.     This Court has personal jurisdiction over Defendants Bowman, Garrett and Farkas who negotiated the Agreements affecting Pennsylvania residents.

15.     Venue is proper in the Eastern District of Pennsylvania as Defendants Taylor Bean, Bowman, Garrett, Farkas, Allen and Dickinson's failure to pay Plaintiffs caused financial damage here.

FACTUAL BACKGROUND

16.     Taylor Bean employs residents of Pennsylvania.

17.     On or about June 17, 2002, Plaintiffs entered into their Agreements with Taylor

Bean. True and exact copies of Plaintiffs' Agreements are attached hereto as Exhibits "A" "B"

and "C" respectively.

18.     The Agreements provided that Plaintiffs were to serve as Executive Vice-

Presidents of Taylor Bean with a fixed salary at the rate of $175,000 per annum during the first

year, and an Executive annual base salary in an amount to be determined by the Board no less

than $175,000 thereafter.  See id. at Sections 2 and 3(a).

19.     The Agreements also provided for a three year term of employment to commence

on June 17, 2002 and continue until June 17, 2005.  At the end of Plaintiffs' third year of

employment, the Agreements would automatically renew for a one (1) year period unless no later

than ninety (90) days, written notice to "terminate at the end of term" was given to all parties.

See id. at Section 1.

20.     The Agreements further provided:

> During the Term, the Executive shall be eligible to participate in a bonus pool (the
> "Bonus Pool" that shall consist of an amount equal to thirty (30) percent of the
> Alternative Mortgage Division's pre-tax and pre-allocation earnings as of the end
> of each calendar month (the "Calculated Bonus Amount"). The Calculated Bonus
> Amount, if any, shall be payable no later then thirty (30) calendar days after the
> end of each month. The distribution of the Bonus Pool shall be at the joint
> discretion of the management team of the Alternative Mortgage Division
> consisting of Robert Davis, William Higgins and Mary Gibbons.  The
> Management Team of the Alternative Lending Division shall submit its plan of
> distribution on a monthly basis to the President in advance of making any
> distributions.

See id. at Section 3(b).

21.     In the event that Plaintiffs' employment was terminated for any reason,

Defendants were still required to pay Plaintiffs pursuant to Section 5(b) of the Agreement which

provides:

> In the event that the Executive's employment hereunder terminates . . . with the company *for any reason*, earned but unpaid Base Salary, accrued but unused vacation time, unpaid expense reimbursements and accrued but unpaid bonus as of the date of termination of employment, shall be payable in full no later than the next scheduled payroll payment date in accordance with the Company's normal payroll practices.

See id. at Section 5(b). (emphasis added).

22.  Davis worked from June 17, 2002 to April 13, 2003.

23.  From January 24, 2003 to March 6, 2003, Davis was not paid his salary totaling approximately $20,192.28.

24.  Davis was not paid bonus monies due pursuant to Section 3(b) of his Agreement.

25.  Upon information and belief, the unpaid commissions total approximately $189,668.

26.  Davis was not provided his benefits under the Executive Stock Option Plan. See Exhibit "A" at Section 3(c).

27.  Each of these payments remains unpaid in excess of thirty days beyond the regularly scheduled payday and no good faith contest or dispute of any wage claim exists.

28.  These wage deficiencies also exceeded five percent of the gross wages payable on two regularly scheduled paydays in the same calendar quarter.

29.  Gibbons worked from June 17, 2002 to July 25, 2003.

30.  From January 24, 2003 to February 20, 2003, Gibbons was not paid her salary totaling approximately $13,461.53.

31.  Gibbons was not paid bonus monies due pursuant to Section 3(b) of her Agreement.

32.  Upon information and belief, the unpaid commissions total approximately $189,668.

33.     Gibbons was not provided her benefits under the Executive Stock Option Plan. See Exhibit "A" at Section 3(c).

34.     Each of these payments remains unpaid in excess of thirty days beyond the regularly scheduled payday and no good faith contest or dispute of any wage claim exists.

35.     These wage deficiencies also exceeded five percent of the gross wages payable on two regularly scheduled paydays in the same calendar quarter.

36.     Higgins worked from June 17, 2002 to April 6, 2005.

37.     From January 24, 2003 to February 20, 2003, Higgins was not paid his salary totaling approximately $13,461.53.

38.     Higgins was not paid bonus monies due pursuant to Section 3(b) of his Agreement.

39.     Upon information and belief, the unpaid commissions total approximately $695,756.

40.     Higgins was not provided his benefits under the Executive Stock Option Plan. See Exhibit "A" at Section 3(c).

41.     Each of these payments remains unpaid in excess of thirty days beyond the regularly scheduled payday and no good faith contest or dispute of any wage claim exists.

42.     These wage deficiencies also exceeded five percent of the gross wages payable on two regularly scheduled paydays in the same calendar quarter.

### COUNT I
### Breach of Contract
### Plaintiffs v. Taylor Bean

43.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as fully set forth herein.

44.     Plaintiffs' Agreement prepared by Taylor Bean provided for specific compensation and equity benefits.

45.     Plaintiffs have fully performed under the Agreement.

46.     Defendant Taylor Bean has breached the Agreement with Plaintiffs by failing to pay salary, bonus, and other compensation due and owing to Plaintiffs pursuant to the Agreement.

47.     Plaintiffs have suffered damages as a result of the breach.

WHEREFORE, for all the foregoing reasons, Plaintiffs Robert D. Davis, Mary L. Gibbons and William Higgins respectfully request that this Court enter an Order granting judgment in their favor against Defendant Taylor Bean on Count I of this Complaint, and awarding them damages in excess of $1.1 million dollars, plus interest, costs, and all other relief this Court deems equitable and just.

**Count II**
**Violation of the Pennsylvania Wage Payment and Collection Law**
**Plaintiffs v. Taylor Bean, Raymond E. Bowman, Gary Garrett, Lee Farkas, Paul Allen and Sherry Dickinson**

48.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-42 as if fully set forth herein.

49.     Plaintiffs, by virtue of living and being employed in Pennsylvania, are protected by Pennsylvania's Wage Payment and Collection Law, 43 Pa. C.S. §260.1, et seq. ("WPCL").

50.     Defendants Taylor Bean, as the employer, and Bowman, Garrett, Farkas, Allen and Dickinson, as decision and policymakers of the employer, are obligated to pay salary, bonus, and other compensation to Plaintiffs.

51.     Said salary, bonus, and other compensation constitutes "wages," "benefits," "fringe benefits" and/or other remuneration recoverable under Pennsylvania's Wage Payment and Collection Law, 43 Pa. C.S. §260.1, et seq. ("WPCL").

52.     Defendants' failure to pay at the required time Plaintiffs' salary, bonus, and other compensation violated the WPCL.

53.     Defendants' retaliatory failure to pay Plaintiffs' salary, bonus, and other compensation under the Agreements is vindictive, in bad faith, and intended to deprive Plaintiffs of the benefits and protections they are owed under the WPCL.

54.     Defendants are wrongfully withholding Plaintiffs' salary, bonus, and other compensation.

55.     As a direct result of Defendants' violations of the WPCL, Plaintiffs have suffered lost wages, benefits, and fringe benefits, and Plaintiffs are entitled to receive liquidated damages, penalties, and attorneys fees as provided by the WPCL.

WHEREFORE, for all the foregoing reasons, Plaintiffs Robert D. Davis, Mary L. Gibbons and William Higgins respectfully request that this Court:

1.     enter judgment in their favor and against Defendants Taylor Bean & Whitaker Mortgage Corporation, Raymond E. Bowman, Gary Garrett, Lee Farkas, Paul Allen and Sherry Dickinson under Pennsylvania's Wage Payment And Collection Law, 43 Pa. C.S. §260.1, et seq. including but not limited to the full amount of withheld wages, bonus monies, and other compensation in amounts to be proven at trial, plus interest;

2.     award Plaintiffs liquidated damages pursuant to Pennsylvania's Wage Payment And Collection Law, 43 Pa. C.S. §260.10 in the amount of twenty-five percent (25%) of the total wages awarded under paragraph (1);

3.    award Plaintiffs costs for reasonable attorneys' fees; and

4.    award such other and further relief as the Court deems appropriate.

## COUNT III
### Constructive Discharge
### Robert D. Davis and Mary L. Gibbons v. Taylor Bean

56.    Davis and Gibbons incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

57.    Davis and Gibbons were constructively discharged from employment.

58.    Said constructive discharge was the result of Taylor Bean's act and/or omissions of a) refusing to pay base salary; b) refusing to pay bonus monies; c) falsely alleging criminal conduct; and d) ignoring legitimate business requests.

59.    Davis continued to contribute to the building of Taylor Bean's business despite the company depriving him of compensation due.

60.    Davis continued to contribute to the building of Taylor Bean's business despite the company depriving him of bonus monies due.

61.    Davis continued to contribute to the building of Taylor Bean's business despite false allegations of losing thousands of dollars for the company.

62.    Davis continued to contribute to the building of Taylor Bean's business despite false allegations of criminal conduct.

63.    Taylor Bean thwarted Davis's attempts to carry out the terms and conditions of the Agreement by its refusal to acknowledge, respond, or follow his requests to perform tasks required for sub-prime business expansion.

64.    Gibbons continued to contribute to the building of Taylor Bean's business despite the company depriving her of compensation due.

65.     Gibbons continued to contribute to the building of Taylor Bean's business despite the company depriving her of bonus monies due.

66.     Gibbons continued to contribute to the building of Taylor Bean's business despite false allegations of losing thousands of dollars for the company.

67.     Gibbons continued to contribute to the building of Taylor Bean's business despite false allegations of criminal conduct.

68.     Taylor Bean thwarted Gibbons's attempts to further develop the business by its refusal to acknowledge, respond, or follow her requests to perform tasks required for sub-prime business expansion.

69.     Gibbons continued to contribute to Taylor Bean's business despite the insistence that she consent to materially different terms of employment to remain employed.

70.     Taylor Bean's failure to pay compensation, public embarrassment and hostile work environment led to their constructive discharge of employment.

71.     As a result of said constructive discharge, Davis and Gibbons lost the ability to generate bonus monies.

WHEREFORE, for all the foregoing reasons, Plaintiffs Robert D. Davis and Mary L. Gibbons respectfully request that this Court enter an Order granting judgment in their favor against Defendant Taylor Bean on Count III of this Complaint, and awarding Plaintiff Robert D. Davis salary owed in the approximate amount of $379,166.66, and awarding Plaintiff Mary L. Gibbons salary owed in the approximate amount of $335,416.67 plus bonus monies, damages, interest, costs, and all other relief this Court deems equitable and just.

Dated: June 15, 2005

Frank R. Emmerich Jr., Esquire
Attorney I.D. No. 76109
Jamie L. Ghen, Esquire
Attorney I.D. No. 94102
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA  19102

<u>JURY DEMAND</u>

Plaintiffs Robert D. Davis, Mary L. Gibbons and William Higgins hereby demand a trial

by jury of twelve jurors as to all counts and claims.


Dated: June 15, 2005

*Frank R. Emmerich Jr.*

Frank R. Emmerich Jr., Esquire
Attorney I.D. No. 76109
Jamie L. Ghen, Esquire
Attorney I.D. No. 94102
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA  19102

# EXHIBIT A

EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (this "Agreement"), dated ~~June 17~~ , 2002 by and between Taylor Bean & Whitaker Mortgage Corporation (the "Company") and Robert D. Davis (the "Executive") having an address of 901 Field Lane, Villanova, Pennsylvania 19085

## WITNESSETH:

WHEREAS, the Executive is willing to serve as of the Company and the Company desires to retain the Executive in that capacity on the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto agree as follows:

Section 1. *Term of Employment.* The Executive's employment under this Agreement shall be effective on June 17, 2002 (the "Commencement Date") and, subject to earlier termination pursuant to Section 5 hereof, shall continue until the third (3rd) anniversary of the Commencement Date the ("Expiration Date") (this period of time being referred to as the "Term"). This agreement shall automatically renew for a one (1) year periods unless no later than ninety (90) days prior to the Expiration Date a party to this agreement serves a written notice to "Terminate at end of Term" upon all other parties to this agreement. Any and all extensions of the Term pursuant to this paragraph shall be included in the definition of Term as that word is used throughout this agreement. Upon expiration of the Term, any period of continued employment by the Executive shall be "at-will," meaning either the Executive or the Company may terminate such employment at any time with or without notice or cause. The Executive hereby represents and warrants that (i) the Executive has the legal capacity to execute and perform this Agreement, (ii) this Agreement is a valid and binding agreement enforceable against him according to its terms, and (iii) the execution and performance of this Agreement by him does not violate the terms of any existing agreement or understanding to which the Executive is a party or by which the Executive may be bound.

Section 2. *Position and Duties.* During the Term, the Executive shall serve as President Of Alternative Mortgage Division of the Company and shall have such powers and duties as are commensurate with such position and as may be conferred upon him from time to time by the President of the Company (the "President"). During the Term, the Executive shall report directly to the President. During the Term, the Executive's principal place of employment shall be in the greater Philadelphia area or at such other location as shall be acceptable to the Executive and the Company. During the Term, and except for illness or incapacity and reasonable vacation periods, the Executive shall devote such of the Executive's business time, attention, skill and efforts as are necessary to the business and affairs of the Company and its subsidiaries and affiliates. It is expressly understood that the Executive may provide services to ContiMortgage Corporation, its affiliates and their successors (collectively, the "Conti"), from time to time; provided, that (i) such activities do not inhibit or negatively impact the performance of the Executive's duties hereunder or inhibit or conflict in any material way with the business of the Company, or its subsidiaries and affiliates with which Executive has been materially involved, and (ii) the Executive is compensated by Conti or other entity and not the Company for the provision of such services to Conti. In addition, the Executive may engage in charitable, educational, religious, civic and other types of activities (all of which shall be deemed to benefit the Company), speaking engagements, membership on the board of directors of other organizations, and other activities to the extent that such activities do not inhibit, conflict with or prohibit the performance of the Executive's duties hereunder.

Section 3. *Compensation*. For all services rendered by the Executive in any capacity required hereunder during the Term, including, without limitation, services as an executive officer, director, or member of any committee of the Company, or any subsidiary, affiliate or division thereof, the Executive shall be compensated as follows:

(a)    The Company shall pay the Executive a fixed salary at the rate of $175,000 per annum during the first year of this Agreement (the "Initial Annual Salary"). During any subsequent period following the first year of the date of this Agreement, the Company shall pay the Executive an annual base salary in an amount to be determined by the Board in its reasonable discretion but shall not be less than the Initial Annual Salary (the "Base Salary"). The Base Salary shall be payable in accordance with the customary payroll practices of the Company, but in no event less frequently than semi-monthly.

(b)    During the Term, the Executive shall be eligible to participate in a bonus pool (the "Bonus Pool") that shall consist of an amount equal to thirty (30) percent of the Alternative Mortgage Division's pre-tax and pre-allocation earnings as of the end of each calendar month (the "Calculated Bonus Amount"). The Calculated Bonus Amount, if any, shall be payable no later than thirty (30) calendar days after the end of each month. The distribution of the Bonus Pool shall be at the joint discretion of the management team of the Alternative Mortgage Division consisting of Robert Davis, William Higgins and Mary Gibbons. The Management Team of the Alternative Lending Division shall submit its plan of distribution on a monthly basis to the President in advance of making any distributions.

(c)    The Executive shall participate in the Taylor, Bean & Whitaker Mortgage Corporation Executive Stock Option Plan when implemented.

(d)    The Executive shall be entitled to participate in all employee benefit plans or programs as stated in the Company's employee manual, and to receive all benefits, perquisites and emoluments, for which any employees of similar title of the Company are eligible under any plan or program now or hereafter established and maintained by the Company, to the fullest extent permissible under the general terms and provisions of such plans or programs and in accordance with the provisions thereof, including, without limitation available, group hospitalization, health, dental care, life, disability or other insurance, tax-qualified and non-qualified pension, savings, thrift and profit-sharing plans, termination or severance pay programs, sick-leave plans, four weeks vacation, travel or accident insurance. Notwithstanding the foregoing, nothing in this Agreement shall preclude the amendment or termination of any such plan or program, provided that such amendment or termination is applicable generally to the senior officers of the Company, Parent Company or any subsidiary or affiliate.

Section 4. *Business Expenses*. The Company shall pay or reimburse the Executive for all reasonable travel or other expenses incurred by the Executive in connection with the performance of the Executive's duties and obligations under this Agreement, subject to the Executive's compliance with Company policies and presentation of appropriate vouchers in accordance with such procedures as the Company may from time to time establish for officers and to preserve any deductions for Federal income taxation purposes to which the Company may be entitled.

Section 5. *Termination; Effect of Termination of Employment*. (a) The Company shall have the right, upon delivery of written notice to the Executive, to terminate the Executive's employment hereunder prior to the expiration of the Term pursuant to a Termination for Cause. The Executive shall have the right, upon delivery of written notice to the Company, to terminate the Executive's employment hereunder prior to the expiration of the Term for any reason. The Executive's employment hereunder shall terminate automatically without action by any party hereto upon the Executive's death.

-2-

(b)     In the event that the Executive's employment hereunder terminates due to death of the Executive or the Executive terminates employment with the Company for any reason, earned but unpaid Base Salary, accrued but unused vacation time, unpaid expense reimbursements and accrued but unpaid bonus as of the date of termination of employment, shall be payable in full no later than the next scheduled payroll payment date in accordance with the Company's normal payroll practices. However, no other payments shall be made, or benefits provided, by the Company under this Agreement except for benefits that have already become vested under the terms of employee benefit programs maintained by the Company or its affiliates for its employees and except as otherwise required by law.

(c)     For purposes of this Agreement, the following terms have the following meanings:                          (i) The term "Termination for Cause" means, as reasonably determined by the Board, a termination of the Executive's employment by the Company due to:

(a) Any willful failure, gross neglect or refusal by the Executive to perform his duties hereunder, unless the Executive shall have cured such failure, gross neglect or refusal (if such failure, gross neglect or refusal is capable of cure as reasonably determined by the Board of Directors) within thirty (30) days after written demand from the Company which provides detail of such failure, gross neglect or refusal;

(b) Any willful, intentional or grossly negligent act or omission which is outside of the Executive's scope of authority as granted by the by-laws or the President of the Company and having the effect of materially injuring the business of the Company;

(c) The Executive's conviction of a felony (including entry of a nolo contendere plea) involving Executive's moral turpitude;

(d) Any theft or embezzlement of the property of the Company; or

(e) Failure to follow a lawful directive of the Board consistent with the Executive's duties hereunder.

(ii)     The term "Permanent Disability" means a termination by the Company due to a medical or psychological disability which qualifies for full benefits under the Company's then-existing disability insurance policy; provided, however, that if the Company does not maintain any such policy on the date of determination, "Permanent Disability" shall mean a termination by the Company upon the inability of the Executive to work for a period of ninety (90) days during any twelve (12) consecutive calendar months due to illness or injury of a physical or mental nature, supported by the completion by the Executive's attending physician of a medical certification form outlining the disability and treatment.

Section 6. *Other Duties of the Executive During and After Term.* (a) The Executive recognizes and acknowledges that all information pertaining to the affairs, business, clients, or customers of the Company or any of its subsidiaries or affiliates with which the Executive has been, is or becomes materially involved (any or all of such entities being hereinafter referred to as the "Business"), as such information may exist from time to time, other than information that the Company has previously made publicly available, is confidential information and is a unique and valuable asset of the Business, access to and knowledge of which are essential to the performance of the Executive's duties under this

Agreement. In consideration of the payments made to him hereunder, the Executive shall not, except to the extent reasonably necessary in the performance of the Executive's duties under this Agreement, divulge to any person, firm, association, corporation, or governmental agency, information concerning the affairs, businesses, clients, or customers names (or other customer identifying information) (except such information as is required by law to be divulged to a government agency or pursuant to lawful process); and shall use the Executive's reasonable best efforts to prevent the disclosure of any such information by others. All records, memoranda, letters, books, papers, reports, accountings, experience or records and documents relating to the Business, whether made by the Executive or otherwise coming into the Executive's possession, are confidential information and are, shall be, and shall remain the property of the Business. The Executive agrees, on termination of the Executive's employment or on demand of the Company, to deliver all confidential information in the Executive's custody or under the Executive's control to the Company.

(b)     The Company's obligation to make payments, or provide for any benefits under this Agreement (except to the extent vested or exercisable) shall cease upon a violation of the preceding provisions of this section. The provisions of this Section 6 shall survive the Executive's termination of the Executive's employment with the Company; provided, however, that in the event that the Company fails to make any of the payments required to be made to the Executive pursuant to the terms of this Agreement, in each case, within two (2) business days of the time periods set forth in this Agreement, the provisions of this Section 6 shall terminate.

(c)     The Executive acknowledges that the Executive has carefully read and considered all of the restraints imposed pursuant to this Section 6 and that each and every one of said restraints is reasonable in respect to subject matter, length of time, and area. The Executive further acknowledges that damages at law would not be a measurable or adequate remedy for a breach of the restrictive covenants contained herein, and accordingly consents to the entry by any court of competent jurisdiction of order enjoining him from violating any of such covenants. If any of the covenants contained in this Section 6 is held to be invalid or unenforceable thereby, the parties agree that the court making such provision or the area or scope of activities covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration, area and/or scope of activities of such provision and in its reduced form said provision shall then be enforceable.

Section 7.  *Withholdings*. The Company may directly or indirectly withhold from any payments made under this Agreement all federal, state, city or other taxes and all other deductions as shall be required or permitted pursuant to any law or governmental regulation or ruling or pursuant to any contributory benefit plan maintained by or on behalf of the Company.

Section 8.  *Consolidation, Merger, or Sale of Assets*. Nothing in this Agreement shall preclude the Company from consolidating or merging into or with, or transferring all or substantially all of its assets to, or engaging in any other business combination with, any other person or entity which assumes this Agreement and all obligations and undertakings of the Company hereunder. Upon such a consolidation, merger, transfer of assets or other business combination and assumption, the term "Company" used herein shall mean such other person or entity and this Agreement shall continue in full force and effect.

Section 9.  *Notices*. All notices, requests, demands and other communications required or permitted hereunder shall be given in writing and shall be deemed to have been duly given if delivered or mailed, postage prepaid, by same day or overnight mail (i) if to the Executive, at the address set forth above, or (ii) if to the Company, as follows:

-4-

Taylor Bean & Whitaker
Lee B. Farkas, C.E.O.
101 N.E. 2nd Street
Ocala, Florida 34470-6642

or to such other address as either party shall have previously specified in writing to the other.

Section 10.  *No Attachment.*  Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge, or hypothecation or to execution, attachment, levy, or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect; *provided, however*, that nothing in this Section 10 shall preclude the assumption of such rights by executors, administrators or other legal representatives of the Executive or the Executive's estate and their assigning any rights hereunder to the person or persons entitled thereto.

Section 11.  *Binding Agreement; No Assignment.*  This Agreement is personal to each of the parties hereto and may not be assigned by either party.  Any attempted assignment in violation of this Section 11 shall be null and void.

Section 12.  *Governing Law.*  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Florida, without reference to the choice of law principles thereof.

Section 13.  *Entire Agreement.*  This Agreement shall constitute the entire agreement among the parties with respect to the matters covered hereby and shall supersede all previous written, oral or implied understandings among them with respect to such matters.

Section 14.  *Amendments.*  This Agreement may only be amended or otherwise modified, and compliance with any provision hereof may only be waived, by a writing executed by all of the parties hereto.  The provisions of this Section 14 may only be amended or otherwise modified by such writing.

Section 15.  *Counterparts.*  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall together be deemed to constitute one and the same instrument.

[Signature page follows]

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed by the undersigned, thereunto duly authorized, and the Executive has signed this Agreement, all as of the date first written above.

Taylor Bean & Whitaker

By: _____
Name: Lee B. Farkas
Title: C.E.O.

_____
Robert Dale Davis

6

# EXHIBIT B

EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (this "Agreement"), dated June 17, 2002 by and between Taylor Bean & Whitaker Mortgage Corporation (the "Company") and William Higgins (the "Executive") having an address of 101 Parliament Circle, North Whales, Pennsylvania 19454.

## W I T N E S S E T H:

WHEREAS, the Executive is willing to serve as of the Company and the Company desires to retain the Executive in that capacity on the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto agree as follows:

Section 1. *Term of Employment.* The Executive's employment under this Agreement shall be effective on June 17, 2002 (the "Commencement Date") and, subject to earlier termination pursuant to Section 5 hereof, shall continue until the third (3rd) anniversary of the Commencement Date the ("Expiration Date") (this period of time being referred to as the "Term"). This agreement shall automatically renew for a one (1) year periods unless no later than ninety (90) days prior to the Expiration Date a party to this agreement serves a written notice to "Terminate at end of Term" upon all other parties to this agreement. Any and all extensions of the Term pursuant to this paragraph shall be included in the definition of Term as that word is used throughout this agreement. Upon expiration of the Term, any period of continued employment by the Executive shall be "at-will," meaning either the Executive or the Company may terminate such employment at any time, with or without notice or cause. The Executive hereby represents and warrants that (i) the Executive has the legal capacity to execute and perform this Agreement, (ii) this Agreement is a valid and binding agreement enforceable against him according to its terms, and (iii) the execution and performance of this Agreement by him does not violate the terms of any existing agreement or understanding to which the Executive is a party or by which the Executive may be bound.

Section 2. *Position and Duties.* During the Term, the Executive shall serve as Executive Vice President of the Company and shall have such powers and duties as are commensurate with such position and as may be conferred upon him from time to time by the President of the Company (the "President"). During the Term, the Executive shall report directly to the President. During the Term, the Executive's principal place of employment shall be in the greater Philadelphia area or at such other location as shall be acceptable to the Executive and the Company. During the Term, and except for illness or incapacity and reasonable vacation periods, the Executive shall devote such of the Executive's business time, attention, skill and efforts as are necessary to the business and affairs of the Company and its subsidiaries and affiliates. It is expressly understood that the Executive may provide services to ContiMortgage Corporation, its affiliates and their successors (collectively, the "Conti"), from time to time; provided, that (i) such activities do not inhibit or negatively impact the performance of the Executive's duties hereunder or inhibit or conflict in any material way with the business of the Company, or its subsidiaries and affiliates with which Executive has been materially involved, and (ii) the Executive is compensated by Conti or other entity and not the Company for the provision of such services to Conti. In addition, the Executive may engage in charitable, educational, religious, civic and other types of activities (all of which shall be deemed to benefit the Company), speaking engagements, membership on the board of directors of other organizations, and other activities to the extent that such activities do not inhibit, conflict with or prohibit the performance of the Executive's duties hereunder.

Section 3. *Compensation.* For all services rendered by the Executive in any capacity required hereunder during the Term, including, without limitation, services as an executive officer, director, or member of any committee of the Company, or any subsidiary, affiliate or division thereof, the Executive shall be compensated as follows:

(a)     The Company shall pay the Executive a fixed salary at the rate of $175,000 per annum during the first year of this Agreement (the "Initial Annual Salary"). During any subsequent period following the first year of the date of this Agreement, the Company shall pay the Executive an annual base salary in an amount to be determined by the Board in its reasonable discretion but shall not be less than the Initial Annual Salary (the "Base Salary"). The Base Salary shall be payable in accordance with the customary payroll practices of the Company, but in no event less frequently than semi-monthly.

(b)     During the Term, the Executive shall be eligible to participate in a bonus pool (the "Bonus Pool") that shall consist of an amount equal to thirty (30) percent of the Alternative Mortgage Division's pre-tax and pre-allocation earnings as of the end of each calendar month (the "Calculated Bonus Amount"). The Calculated Bonus Amount, if any, shall be payable no later than thirty (30) calendar days after the end of each month. The distribution of the Bonus Pool shall be at the joint discretion of the management team of the Alternative Mortgage Division consisting of Robert Davis, William Higgins and Mary Gibbons. The Management Team of the Alternative Lending Division shall submit its plan of distribution on a monthly basis to the President in advance of making any distributions.

(c)     The Executive shall participate in the Taylor, Bean & Whitaker Mortgage Corporation Executive Stock Option Plan when implemented.

(d)     The Executive shall be entitled to participate in all employee benefit plans or programs as stated in the Company's employee manual, and to receive all benefits, perquisites and emoluments, for which any employees of similar title of the Company are eligible under any plan or program now or hereafter established and maintained by the Company, to the fullest extent permissible under the general terms and provisions of such plans or programs and in accordance with the provisions thereof, including, without limitation available, group hospitalization, health, dental care, life, disability or other insurance, tax-qualified and non-qualified pension, savings, thrift and profit-sharing plans, termination or severance pay programs, sick-leave plans, four weeks vacation, travel or accident insurance. Notwithstanding the foregoing, nothing in this Agreement shall preclude the amendment or termination of any such plan or program, provided that such amendment or termination is applicable generally to the senior officers of the Company, Parent Company or any subsidiary or affiliate.

Section 4. *Business Expenses.* The Company shall pay or reimburse the Executive for all reasonable travel or other expenses incurred by the Executive in connection with the performance of the Executive's duties and obligations under this Agreement, subject to the Executive's compliance with Company policies and presentation of appropriate vouchers in accordance with such procedures as the Company may from time to time establish for officers and to preserve any deductions for Federal income taxation purposes to which the Company may be entitled.

Section 5. *Termination; Effect of Termination of Employment.* (a) The Company shall have the right, upon delivery of written notice to the Executive, to terminate the Executive's employment hereunder prior to the expiration of the Term pursuant to a Termination for Cause. The Executive shall have the right, upon delivery of written notice to the Company, to terminate the Executive's employment hereunder prior to the expiration of the Term for any reason. The Executive's employment hereunder shall terminate automatically without action by any party hereto upon the Executive's death.

(b)     In the event that the Executive's employment hereunder terminates due to death of the Executive or the Executive terminates employment with the Company for any reason, earned but unpaid Base Salary, accrued but unused vacation time, unpaid expense reimbursements and accrued but unpaid bonus as of the date of termination of employment, shall be payable in full no later than the next scheduled payroll payment date in accordance with the Company's normal payroll practices. However, no other payments shall be made, or benefits provided, by the Company under this Agreement except for benefits that have already become vested under the terms of employee benefit programs maintained by the Company or its affiliates for its employees and except as otherwise required by law.

(c)     For purposes of this Agreement, the following terms have the following meanings:

(i) The term "Termination for Cause" means, as reasonably determined by the Board, a termination of the Executive's employment by the Company due to:

(a) Any willful failure, gross neglect or refusal by the Executive to perform his duties hereunder, unless the Executive shall have cured such failure, gross neglect or refusal (if such failure, gross neglect or refusal is capable of cure as reasonably determined by the Board of Directors) within thirty (30) days after written demand from the Company which provides detail of such failure, gross neglect or refusal;

(b) Any willful, intentional or grossly negligent act or omission which is outside of the Executive's scope of authority as granted by the by-laws or the President of the Company and having the effect of materially injuring the business of the Company;

(c) The Executive's conviction of a felony (including entry of a nolo contendere plea) involving Executive's moral turpitude;

(d) Any theft or embezzlement of the property of the Company; or

(e) Failure to follow a lawful directive of the Board consistent with the Executive's duties hereunder.

(ii)     The term "Permanent Disability" means a termination by the Company due to a medical or psychological disability which qualifies for full benefits under the Company's then-existing disability insurance policy; *provided, however,* that if the Company does not maintain any such policy on the date of determination, "Permanent Disability" shall mean a termination by the Company upon the inability of the Executive to work for a period of ninety (90) days during any twelve (12) consecutive calendar months due to illness or injury of a physical or mental nature, supported by the completion by the Executive's attending physician of a medical certification form outlining the disability and treatment.

Section 6. *Other Duties of the Executive During and After Term.* (a) The Executive recognizes and acknowledges that all information pertaining to the affairs, business, clients, or customers of the Company or any of its subsidiaries or affiliates with which the Executive has been, is or becomes materially involved (any or all of such entities being hereinafter referred to as the "Business"), as such information may exist from time to time, other than information that the Company has previously made publicly available, is confidential information and is a unique and valuable asset of the Business, access to and knowledge of which are essential to the performance of the Executive's duties under this Agreement. In consideration of the payments made to him hereunder, the Executive shall not, except to

the extent reasonably necessary in the performance of the Executive's duties under this Agreement, divulge to any person, firm, association, corporation, or governmental agency, information concerning the affairs, businesses, clients, or customers names (or other customer identifying information) (except such information as is required by law to be divulged to a government agency or pursuant to lawful process); and shall use the Executive's reasonable best efforts to prevent the disclosure of any such information by others. All records, memoranda, letters, books, papers, reports, accountings, experience or records and documents relating to the Business, whether made by the Executive or otherwise coming into the Executive's possession, are confidential information and are, shall be, and shall remain the property of the Business. The Executive agrees, on termination of the Executive's employment or on demand of the Company, to deliver all confidential information in the Executive's custody or under the Executive's control to the Company.

(b)     The Company's obligation to make payments, or provide for any benefits under this Agreement (except to the extent vested or exercisable) shall cease upon a violation of the preceding provisions of this section. The provisions of this Section 6 shall survive the Executive's termination of the Executive's employment with the Company; provided, however, that in the event that the Company fails to make any of the payments required to be made to the Executive pursuant to the terms of this Agreement, in each case, within two (2) business days of the time periods set forth in this Agreement, the provisions of this Section 6 shall terminate.

(c)     The Executive acknowledges that the Executive has carefully read and considered all of the restraints imposed pursuant to this Section 6 and that each and every one of said restraints is reasonable in respect to subject matter, length of time, and area. The Executive further acknowledges that damages at law would not be a measurable or adequate remedy for a breach of the restrictive covenants contained herein, and accordingly consents to the entry by any court of competent jurisdiction of order enjoining him from violating any of such covenants. If any of the covenants contained in this Section 6 is held to be invalid or unenforceable because of the duration of such provision or the area or scope of activities covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration, area and/or scope of activities of such provision and in its reduced form said provision shall then be enforceable.

Section 7.  *Withholdings.* The Company may directly or indirectly withhold from any payments made under this Agreement all federal, state, city or other taxes and all other deductions as shall be required or permitted pursuant to any law or governmental regulation or ruling or pursuant to any contributory benefit plan maintained by or on behalf of the Company.

Section 8.  *Consolidation, Merger, or Sale of Assets.* Nothing in this Agreement shall preclude the Company from consolidating or merging into or with, or transferring all or substantially all of its assets to, or engaging in any other business combination with, any other person or entity which assumes this Agreement and all obligations and undertakings of the Company hereunder. Upon such a consolidation, merger, transfer of assets or other business combination and assumption, the term "Company" used herein shall mean such other person or entity and this Agreement shall continue in full force and effect.

Section 9.  *Notices.* All notices, requests, demands and other communications required or permitted hereunder shall be given in writing and shall be deemed to have been duly given if delivered or mailed, postage prepaid, by same day or overnight mail (i) if to the Executive, at the address set forth above, or (ii) if to the Company, as follows:

Taylor Bean & Whitaker

-4-

Lee B. Farkas, C.E.O.
101 N.E. 2nd Street
Ocala, Florida 34470-6642

or to such other address as either party shall have previously specified in writing to the other.

Section 10. *No Attachment.* Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge, or hypothecation or to execution, attachment, levy, or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect; *provided, however,* that nothing in this Section 10 shall preclude the assumption of such rights by executors, administrators or other legal representatives of the Executive or the Executive's estate and their assigning any rights hereunder to the person or persons entitled thereto.

Section 11. *Binding Agreement; No Assignment.* This Agreement is personal to each of the parties hereto and may not be assigned by either party. Any attempted assignment in violation of this Section 11 shall be null and void.

Section 12. *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Florida, without reference to the choice of law principles thereof.

Section 13. *Entire Agreement.* This Agreement shall constitute the entire agreement among the parties with respect to the matters covered hereby and shall supersede all previous written, oral or implied understandings among them with respect to such matters.

Section 14. *Amendments.* This Agreement may only be amended or otherwise modified, and compliance with any provision hereof may only be waived, by a writing executed by all of the parties hereto. The provisions of this Section 14 may only be amended or otherwise modified by such writing.

Section 15. *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall together be deemed to constitute one and the same instrument.

[Signature page follows]

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed by the undersigned, thereunto duly authorized, and the Executive has signed this Agreement, all as of the date first written above.

Taylor Bean & Whitaker

By: _____
    Name: Lee B. Farkas
    Title: C.E.O.

_____
William Patrick Higgins

6

# EXHIBIT C

EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (this "Agreement"), dated June 17 , 2002 by and between Taylor Bean & Whitaker Mortgage Corporation (the "Company") and Mary Lourdes Gibbons (the "Executive") having an address of 2003 St. Andrews Drive, Berwyn, Pennsylvania 19312

W I T N E S S E T H:

WHEREAS, the Executive is willing to serve as of the Company and the Company desires to retain the Executive in that capacity on the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties hereto agree as follows:

Section 1. *Term of Employment.* The Executive's employment under this Agreement shall be effective on June 17, 2002 (the "Commencement Date") and, subject to earlier termination pursuant to Section 5 hereof, shall continue until the third (3rd) anniversary of the Commencement Date the ("Expiration Date") (this period of time being referred to as the "Term"). This agreement shall automatically renew for a one (1) year periods unless no later than ninety (90) days prior to the Expiration Date a party to this agreement serves a written notice to "Terminate at end of Term" upon all other parties to this agreement. Any and all extensions of the Term pursuant to this paragraph shall be included in the definition of Term as that word is used throughout this agreement. Upon expiration of the Term, any period of continued employment by the Executive shall be "at-will," meaning either the Executive or the Company may terminate such employment at any time, with or without notice or cause. The Executive hereby represents and warrants that (i) the Executive has the legal capacity to execute and perform this Agreement, (ii) this Agreement is a valid and binding agreement enforceable against him according to its terms, and (iii) the execution and performance of this Agreement by him does not violate the terms of any existing agreement or understanding to which the Executive is a party or by which the Executive may be bound.

Section 2. *Position and Duties.* During the Term, the Executive shall serve as Legal Officer of the Company and shall have such powers and duties as are commensurate with such position and as may be conferred upon her from time to time by the President of the Company (the "President"). During the Term, the Executive shall report directly to the President. During the Term, the Executive's principal place of employment shall be in the greater Philadelphia area or at such other location as shall be acceptable to the Executive and the Company. During the Term, and except for illness or incapacity and reasonable vacation periods, the Executive shall devote such of the Executive's business time, attention, skill and efforts as are necessary to the business and affairs of the Company and its subsidiaries and affiliates. It is expressly understood that the Executive may provide services to ContiMortgage Corporation, its affiliates and their successors (collectively, the "Conti"), from time to time; provided, that (i) such activities do not inhibit or negatively impact the performance of the Executive's duties hereunder or inhibit or conflict in any material way with the business of the Company, or its subsidiaries and affiliates with which Executive has been materially involved, and (ii) the Executive is compensated by Conti or other entity and not the Company for the provision of such services to Conti. In addition, the Executive may engage in charitable, educational, religious, civic and other types of activities (all of which shall be deemed to benefit the Company), speaking engagements, membership on the board of directors of other organizations, and other activities to the extent that such activities do not inhibit, conflict with or prohibit the performance of the Executive's duties hereunder.

Section 3. *Compensation.* For all services rendered by the Executive in any capacity required hereunder during the Term, including, without limitation, services as an executive officer, director, or member of any committee of the Company, or any subsidiary, affiliate or division thereof, the Executive shall be compensated as follows:

(a)    The Company shall pay the Executive a fixed salary at the rate of $175,000 per annum during the first year of this Agreement (the "Initial Annual Salary"). During any subsequent period following the first year of the date of this Agreement, the Company shall pay the Executive an annual base salary in an amount to be determined by the Board in its reasonable discretion but shall not be less than the Initial Annual Salary (the "Base Salary"). The Base Salary shall be payable in accordance with the customary payroll practices of the Company, but in no event less frequently than semi-monthly.

(b)    During the Term, the Executive shall be eligible to participate in a bonus pool (the "Bonus Pool") that shall consist of an amount equal to thirty (30) percent of the Alternative Mortgage Division's pre-tax and pre-allocation earnings as of the end of each calendar month (the "Calculated Bonus Amount"). The Calculated Bonus Amount, if any, shall be payable no later than thirty (30) calendar days after the end of each month. The distribution of the Bonus Pool shall be at the joint discretion of the management team of the Alternative Mortgage Division consisting of Robert Davis, William Higgins and Mary Gibbons. The Management Team of the Alternative Lending Division shall submit its plan of distribution on a monthly basis to the President in advance of making any distributions.

(c)    The Executive shall participate in the Taylor, Bean & Whitaker Mortgage Corporation Executive Stock Option Plan when implemented.

(d)    The Executive shall be entitled to participate in all employee benefit plans or programs as stated in the Company's employee manual, and to receive all benefits, perquisites and emoluments, for which any employees of similar title of the Company are eligible under any plan or program now or hereafter established and maintained by the Company, to the fullest extent permissible under the general terms and provisions of such plans or programs and in accordance with the provisions thereof, including, without limitation available, group hospitalization, health, dental care, life, disability or other insurance, tax-qualified and non-qualified plans, savings, thrift and profit-sharing plans, termination or severance pay programs, sick-leave plans, four weeks vacation, travel or accident insurance. Notwithstanding the foregoing, nothing in this Agreement shall preclude the amendment or termination of any such plan or program, provided that such amendment or termination is applicable generally to the senior officers of the Company, Parent Company or any subsidiary or affiliate.

Section 4. *Business Expenses.* The Company shall pay or reimburse the Executive for all reasonable travel or other expenses incurred by the Executive in connection with the performance of the Executive's duties and obligations under this Agreement, subject to the Executive's compliance with Company policies and presentation of appropriate vouchers in accordance with such procedures as the Company may from time to time establish for officers and to preserve any deductions for Federal income taxation purposes to which the Company may be entitled.

Section 5. *Termination; Effect of Termination of Employment.* (a) The Company shall have the right, upon delivery of written notice to the Executive, to terminate the Executive's employment hereunder prior to the expiration of the Term pursuant to a Termination for Cause. The Executive shall have the right, upon delivery of written notice to the Company, to terminate the Executive's employment hereunder prior to the expiration of the Term for any reason. The Executive's employment hereunder shall terminate automatically without action by any party hereto upon the Executive's death.

(b)    In the event that the Executive's employment hereunder terminates due to death of the Executive or the Executive terminates employment with the Company for any reason, earned but unpaid Base Salary, accrued but unused vacation time, unpaid expense reimbursements and accrued but unpaid bonus as of the date of termination of employment, shall be payable in full no later than the next scheduled payroll payment date in accordance with the Company's normal payroll practices. However, no other payments shall be made, or benefits provided, by the Company under this Agreement except for benefits that have already become vested under the terms of employee benefit programs maintained by the Company or its affiliates for its employees and except as otherwise required by law.

(c)    For purposes of this Agreement, the following terms have the following meanings:

(i) The term "Termination for Cause" means, as reasonably determined by the Board, a termination of the Executive's employment by the Company due to:

(a) Any willful failure, gross neglect or refusal by the Executive to perform his duties hereunder, unless the Executive shall have cured such failure, gross neglect or refusal (if such failure, gross neglect or refusal is capable of cure as reasonably determined by the Board of Directors) within thirty (30) days after written demand from the Company which provides detail of such failure, gross neglect or refusal;

(b) Any willful, intentional or grossly negligent act or omission which is outside of the Executive's scope of authority as granted by the by-laws or the President of the Company and having the effect of materially injuring the business of the Company;

(c) The Executive's conviction of a felony (including entry of a nolo contendere plea) involving Executive's moral turpitude;

(d) Any theft or embezzlement of the property of the Company; or

(e) Failure to follow a lawful directive of the Board consistent with the Executive's duties hereunder.

(ii)    The term "Permanent Disability" means a termination by the Company due to a medical or psychological disability which qualifies for full benefits under the Company's then-existing disability insurance policy; *provided, however,* that if the Company does not maintain any such policy on the date of determination, "Permanent Disability" shall mean a termination by the Company upon the inability of the Executive to work for a period of ninety (90) days during any twelve (12) consecutive calendar months due to illness or injury of a physical or mental nature, supported by the completion by the Executive's attending physician of a medical certification form outlining the disability and treatment.

Section 6. *Other Duties of the Executive During and After Term.* (a) The Executive recognizes and acknowledges that all information pertaining to the affairs, business, clients, or customers of the Company or any of its subsidiaries or affiliates with which the Executive has been, is or becomes materially involved (any or all of such entities being hereinafter referred to as the "Business"), as such information may exist from time to time, other than information that the Company has previously made publicly available, is confidential information and is a unique and valuable asset of the Business, access to and knowledge of which are essential to the performance of the Executive's duties under this

Agreement. In consideration of the payments made to him hereunder, the Executive shall not, except to the extent reasonably necessary in the performance of the Executive's duties under this Agreement, divulge to any person, firm, association, corporation, or governmental agency, information concerning the affairs, businesses, clients, or customers names (or other customer identifying information) (except such information as is required by law to be divulged to a government agency or pursuant to lawful process); and shall use the Executive's reasonable best efforts to prevent the disclosure of any such information by others. All records, memoranda, letters, books, papers, reports, accountings, experience or records and documents relating to the Business, whether made by the Executive or otherwise coming into the Executive's possession, are confidential information and are, shall be, and shall remain the property of the Business. The Executive agrees, on termination of the Executive's employment or on demand of the Company, to deliver all confidential information in the Executive's custody or under the Executive's control to the Company.

(b)     The Company's obligation to make payments, or provide for any benefits under this Agreement (except to the extent vested or exercisable) shall cease upon a violation of the preceding provisions of this section. The provisions of this Section 6 shall survive the Executive's termination of the Executive's employment with the Company; provided, however, that in the event that the Company fails to make any of the payments required to be made to the Executive pursuant to the terms of this Agreement, in each case, within two (2) business days of the time periods set forth in this Agreement, the provisions of this Section 6 shall terminate.

(c)     The Executive acknowledges that the Executive has carefully read and considered all of the restraints imposed pursuant to this Section 6 and that each and every one of said restraints is reasonable in respect to subject matter, length of time, and area. The Executive further acknowledges that damages at law would not be a measurable or adequate remedy for a breach of the restrictive covenants contained herein, and accordingly consents to the entry by any court of competent jurisdiction of order enjoining him from violating any of such covenants. If any of the covenants contained in this Section 6 is held to be invalid or unenforceable because of the duration of such provision or the area or scope of activities covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration, area and/or scope of activities of such provision and in its reduced form said provision shall then be enforceable.

Section 7. *Withholdings*. The Company may directly or indirectly withhold from any payments made under this Agreement all federal, state, city or other taxes and all other deductions as shall be required or permitted pursuant to any law or governmental regulation or ruling or pursuant to any contributory benefit plan maintained by or on behalf of the Company.

Section 8. *Consolidation, Merger, or Sale of Assets*. Nothing in this Agreement shall preclude the Company from consolidating or merging into or with, or transferring all or substantially all of its assets to, or engaging in any other business combination with, any other person or entity which assumes this Agreement and all obligations and undertakings of the Company hereunder. Upon such a consolidation, merger, transfer of assets or other business combination and assumption, the term "Company" used herein shall mean such other person or entity and this Agreement shall continue in full force and effect.

Section 9. *Notices*. All notices, requests, demands and other communications required or permitted hereunder shall be given in writing and shall be deemed to have been duly given if delivered or mailed, postage prepaid, by same day or overnight mail (i) if to the Executive, at the address set forth above, or (ii) if to the Company, as follows:

Taylor Bean & Whitaker
Lee B. Farkas, C.E.O.
101 N.E. 2nd Street
Ocala, Florida 34470-6642

or to such other address as either party shall have previously specified in writing to the other.

Section 10. *No Attachment.* Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge, or hypothecation or to execution, attachment, levy, or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect; *provided, however,* that nothing in this Section 10 shall preclude the assumption of such rights by executors, administrators or other legal representatives of the Executive or the Executive's estate and their assigning any rights hereunder to the person or persons entitled thereto.

Section 11. *Binding Agreement; No Assignment.* This Agreement is personal to each of the parties hereto and may not be assigned by either party. Any attempted assignment in violation of this Section 11 shall be null and void.

Section 12. *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Florida, without reference to the choice of law principles thereof.

Section 13. *Entire Agreement.* This Agreement shall constitute the entire agreement among the parties with respect to the matters covered hereby and shall supersede all previous written, oral or implied understandings among them with respect to such matters.

Section 14. *Amendments.* This Agreement may only be amended or otherwise modified, and compliance with any provision hereof may only be waived, by a writing executed by all of the parties hereto. The provisions of this Section 14 may only be amended or otherwise modified by such writing.

Section 15. *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall together be deemed to constitute one and the same instrument.

[Signature page follows]

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed by the undersigned, thereunto duly authorized, and the Executive has signed this Agreement, all as of the date first written above.

Taylor Bean & Whitaker

By: _____
Name:  Lee B. Farkas
Title:  C.E.O.

_____
Mary Lourdes Gibbons

# UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF TAYLOR, BEAN & WHITAKER MORTGAGE CORP.

The undersigned being all of the Directors of Taylor, Bean & Whitaker Mortgage Corp. ("Company ") hereby consent to the following.

1. **Employment Agreements.**

WHEREAS, The Directors deem it to be advisable and in the best interest of the Company to secure the services of Robert D. Davis, William P. Higgins and Mary L. Gibbons (the "Employees") through the execution of employment agreements (the "Employment Agreements");

WHEREAS, the Company has negotiated the Employment Agreements with the Employees in substantially the form attached hereto as Exhibit A;

NOW THEREFORE, BE IT RESOLVED, that the Company's officers are hereby authorized to execute the Employment Agreements on behalf of the Company;

FURTHER RESOLVED, that the officers of the Company are authorized and directed to take such actions on behalf of the Company as are necessary and appropriate in order for the Company to perform its obligations under the Employment Agreements.

2. **Real Property Lease, Horsham, PA.**

WHEREAS, the Directors deem it advisable and in the best interest of the Company to establish a physical presence in Pennsylvania;

WHEREAS, the Company has negotiated and executed a sublease of approximately 3994 rentable square feet in the premises known as 755 Business Center Drive, Horsham, PA 19044 (the "Sublease") a copy of which is attached hereto as Exhibit B.

NOW THEREFORE, BE IT RESOLVED, that the Board of Directors hereby approve, authorize and confirm the Sublease and further authorize, approve and direct such actions by the officers of the Company as necessary and appropriate in order for the Company to perform its obligations under the Sublease;

FURTHER RESOLVED, that the negotiation and execution of the Sublease is hereby ratified, approved, adopted and confirmed.

This consent may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same agreement. By signing hereunder, the Directors direct that this Consent be filed with the minutes of the Company.

*[SIGNATURES CONTINUED ON NEXT PAGE]*

IN WITNESS WHEREOF, we have hereunder set our hands this _____ day of
_____, 2002.

DIRECTORS

_Sherry Dickinson_
Sherry Dickinson

_Lee Farkas_
Lee Farkas

_Coda C. Roberson III_
coda c. Roberson III